### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: NORTHWEST 15TH STREET ASSOCIATES** | : | **Chapter 11** |
| | : | |
| **Debtor** | : | **Bky. No.  10-15129 ELF** |

# M E M O R A N D U M

## I. INTRODUCTION

Northwest 15th Street Associates ("the Debtor") is the owner of the surface and air rights
to a parcel of real property located on the northwest corner of 15th and Arch Streets in
Philadelphia, Pennsylvania ("the Property").  In April 2009, Debtor entered into a written
contract with EwingCole, Inc. ("Ewing"), pursuant to which Ewing provided architectural
services to the Debtor.  The services included the preparation of certain architectural plans.  The
plans were prepared in connection with a multi-party project for the construction of a sixteen-
story courthouse and underground parking garage on the Property ('the Courthouse Project").
The parties contemplated that the new courthouse would be the future home of the Philadelphia
Family Court.  The Debtor not only owned the Property, but served as the developer of the sit for
the Courthouse Project.  Also involved in the Courthouse Project were: (1) the First Judicial
District of Pennsylvania ("the FJD"), the party for whom the Debtor was to build the courthouse
and (2) the Philadelphia Parking Authority ("the PPA"), the party that granted the surface and air
rights to the Debtor (while retaining the below-surface rights) and for whom the Debtor was to
construct the underground garage.

Shortly after the filing of this case, the parties brought before the bankruptcy court a
dispute involving ownership of certain architectural plans that Ewing prepared in connection

with the Courthouse Project.  Ewing and the Debtor each claim ownership of the plans that

Ewing completed in March 2010 ("the March Plans"). Their dispute is grounded in the parties'

different interpretations of their written contract.

Ewing has requested the entry of an order: (1) determining that Ewing, as the rightful

owner of the plans, may use and exercise control over them without violating the automatic stay,

see 11 U.S.C. §362(a)(3),[1] or (b) otherwise granting Ewing relief from the automatic stay to do

so for "cause," see 11 U.S.C. §362(d)(1).[2]  The Debtor has opposed the relief requested by

Ewing, asserting that it owns the March Plans, that the March Plans are property of the

bankruptcy estate, see 11 U.S.C. §541(a), and that cause does not exist to authorize Ewing to use

or exercise control over bankruptcy estate property.

Based on the evidence presented at the hearing held in this matter and my interpretation

of the parties' contract, I have concluded that Ewing's ownership claim over the disputed March

Plans is superior to the Debtor's.  As a result, on August 26, 2010, I entered an order granting

Ewing's request for relief under 11 U.S.C. §362(d).[3]  In this Memorandum, to be docketed on

---

[1]     11 U.S.C. §362(a)(3) provides that the filing of a bankruptcy petition stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

[2]     11 U.S.C. §362(d)(1) provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . .

[3]     I entered the order prior to, rather than simultaneously with, this Memorandum in order
(continued...)

August 27, 2010, I explain the reasons for my ruling.

## II.  PROCEDURAL BACKGROUND

The Debtor commenced this case by filing a voluntary petition under chapter 11 of the

Bankruptcy Code on June 23, 2010.   In the petition, the Debtor described its business as "single

asset real estate."[4]  (See Debtor's Schedule A) (Doc. # 17).[5]

On July 23, 2010, the FJD filed a motion for relief from the automatic stay ("the FJD

Motion") (Doc. # 38).  On the same day, the PPA filed a motion for relief from the automatic

stay ("the PPA Motion") (Doc. # 37).[6]  On July 28, 2010, the Debtor filed a Motion to Strike both the

---

[3](...continued)
to maximize the time available to the affected parties between the court's decision and the next scheduled
hearing (August 30, 2010) on related motions.  The related motions pending before the court are
described in Part II, infra.  See nn. 6-7, infra & accompanying text.

[4]    The term "single asset real estate" is defined in the Bankruptcy Code as:

> real property constituting a single property or project, other than residential real
> property with fewer than 4 residential units, which generates substantially all of
> the gross income of a debtor who is not a family farmer and on which no
> substantial business is being conducted by a debtor other than the business of
> operating the real property and activities incidental.

11 U.S.C. §101(51B) (emphasis added).

[5]    I may take judicial notice of the content of documents filed in the case for the purpose of
ascertaining the timing and status of events in the case and facts not reasonably in dispute.  See Fed. R.
Evid. 201 (applicable by virtue of Fed. R. Bankr. P. 9017); In re Scholl, 1998 WL 546607, at *1 n. 1
(Bankr. E.D. Pa., Aug. 26, 1998); see also In re Indian Palm Assoc., Ltd., 61 F.3d 197, 205 (3d Cir.
1995).

[6]    In its motion, the PPA asserted that:

(a) the Debtor is in default of its obligations under a "Development Services
(continued...)

FJD Motion and the PPA Motion, primarily on the ground that the relief requested by the movants

required the initiation of an adversary proceeding pursuant to Fed. R. Bankr. P. 7001. By order

dated August 19, 2010, the court denied the Debtor's Motion to Strike without prejudice to any

defenses the Debtor may have to the Motions. (Doc # 72). However, presently, only the FJD

Motion remains pending before the court.[7]

     In its motion, the FJD contends that the March Plans are owned by Ewing.[8]

Alternatively, the FJD contends it owns the March Plans, but that under no circumstances does

the Debtor own the Plans. The FJD requests the entry of an order authorizing the FJD to use the

March Plans in connection with the planning and construction of the new Family Court building.

(FJD Motion ¶¶1, 27, 35, 38).

---

[6](...continued)
    Agreement" ("the DSA") between the Debtor and the PPA;

    (b) the DSA is secured by a mortgage against the Property and a deed-in-lieu of
foreclosure that is presently being held in escrow;

    (c) the Debtor's breaches of the DSA are non-curable; and

    (d) it is entitled to relief from the automatic stay to enforce its mortgage and or
otherwise divest the Debtor of title to the Property by recording the deed-in-lieu.

(PPA Motion ¶¶3, 5, 7, 8). The Debtor opposed the relief sought by the PPA on the grounds, inter alia,
that it has not breached its obligations in any material fashion and that any breach that may have occurred
is curable.

[7]    On August 26, 2010, the PPA withdrew its Motion, electing instead to seek comparable
relief in an adversary proceeding that is pending in this court (Adv. No. 10-0328).

[8]    Apparently, the FJD contemplated that if it were granted relief from the automatic stay, it
would easily reach an agreement with Ewing that would permit the FJD to use the March Plans in
connection with the Courthouse Project.

On July 26, 2010, Ewing filed what it styled as a "Joinder" to the FJD Motion. (Doc. # 44). In the Joinder, Ewing asserted that it is the owner of the Plans and requested that the court grant the FJD Motion. (See Ewing Joinder ¶¶3, 25, prayer for relief).

On August 11, 2010, one week before the scheduled hearings, the court conducted a pretrial conference on the FJD Motion and the (then still pending) PPA Motion. After a colloquy with the court, the parties agreed that the hearing on the FJD Motion would be handled as follows:

1. the court would first hold a hearing on the issues raised by Ewing's Joinder, i.e., under the Ewing Contract, whether the Debtor or Ewing owns the Plans ("the First Hearing");

2. if the court determined that Ewing owns the plans and may exercise control over them without violating the automatic stay, or otherwise grants relief for Ewing to do so, the FJD likely would withdraw its request for relief from the automatic stay;[9] if, however, the Debtor prevailed on the issue, a further hearing would be held on the FJD Motion ("the Second Hearing").[10]

In effect, while not expressly labeled as such in the colloquy, the parties agreed that Ewing's "Joinder" would be treated as a separate Motion for Relief from the Automatic Stay.[11]

On August 18, 2010, the First Hearing was held and concluded. Ewing submitted a post-hearing memorandum in support of its position on August 20, 2010. The Debtor did likewise on

---

[9]      See n.8, supra.

[10]      It also was decided that the hearing on the (now withdrawn) PPA Motion would be held after the Second Hearing.

[11]      Alternatively, the First Hearing and Second Hearings could be conceptualized as a bifurcation of the FJD's Motion. However, when the First Hearing was held, Ewing, rather than the FJD, took the "laboring oar" and acted as the moving party. Therefore, I will follow the parties' lead and treat Ewing's Joinder as if it were a Motion. See Fed. R. Bankr. P. 1001 (the Bankruptcy Rules "shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding").

-5-

August 23, 2010.  The court entered its order granting Ewing's request for relief from the

automatic stay on August 26, 2010.

## III. FINDINGS OF FACT

Based on the evidence presented at the First Hearing,[12] I make the following findings of

fact.[13]

1.    In 2006, Ewing was retained on a pro bono basis by the "tenant representative" of the FJD

to assist the FJD in evaluating potential sites for the construction of a new facility to house

the Philadelphia Family Court.

2.    In April 2008, the FJD selected the Property as the development site.

3.    In April 2008, the Debtor was (and presently is) the owner of the surface and air rights to

the Property.  The PPA owns the below-surface rights to the Property.

4.    Pursuant to a Development Services Agreement between the PPA and the Debtor,

originally entered into in 2004, and subsequently amended on various occasions, including

on May 23, 2008, and other related agreements, in 2008, the Debtor agreed to serve as the

developer for the construction of a courthouse and an underground garage on the Property

(i.e., the Courthouse Project).

---

[12]    Three witnesses testified at the hearing.  John Gerbner, the President of Ewing testified
on Ewing's behalf.  Harvey Kolodner, an individual with thirty years of experience in
architectural firm management, and Donald Pulver, the Debtor's principal, testified on the
Debtor's behalf.

[13]    To provide context and improve the clarity of the factual recitation, and based on my
review of the parties' various motions, responses and other written submissions, the recitation includes
certain facts that I understand to be undisputed, even though, strictly speaking, the facts are not part the
evidentiary record made at the First Hearing.

5.    Between April 2008 and April 2009, Ewing began providing architectural services to the

Debtor for the development of the Courthouse Project on the Property.  During that time

period, the parties did not have a signed, written contract governing the terms of the

Debtor's retention of Ewing as the architect for the Courthouse Project.

6.    Between April 2008 and April 2009, Ewing and the Debtor negotiated the terms of a

written contract.

7.    In the negotiations, Ewing was represented by John Gerbner, the President of Ewing and an

architect with thirty (30) years of experience in the field.  The Debtor was represented by

Anastasius Efstratiades, an attorney at the law firm Obermayer Rebmann Maxwell &

Hippel, LLP.

8.    On April 7, 2009, Ewing and the Debtor entered into a written contact, titled "AIA

Document B141 - Standard Form of Agreement Between Owner and Architect," which

included a Part I and Part II ("the O/A Agreement" or "the Agreement").

9.    In the O/A Agreement, Ewing agreed to provide various services to the Debtor including:

(a) evaluation and planning services, (b) design services; (c) preparation of construction

documents (such as drawings and specifications); (d) assistance in developing and

preparing bidding and procurement information; (e) assistance in obtaining competitive

bids and proposals; (f) assistance in administering contracts with contractors; (f) site

evaluations during construction; and (g) review of facility operations after substantial

completion of the project.  (O/A Agreement §§2.1.1 - 2.8.3).

10.    The O/A Agreement between the parties is based on a form contract developed by the

American Institute of Architects ("the Form O/A Agreement").

-7-

11.   The O/A Agreement includes an "integration clause."(O/A Agreement §1.4.1).

12.   As a result of negotiations, the parties modified certain provisions of the Form O/A

Agreement by striking out certain words and adding other words.

13.   The parties modified §1.3.2.1 of the Form O/A Agreement as follows:[14]

> Drawings, specifications and other documents, including those in electronic form, prepared by the Architect, and the Architect's consultants are Instruments of Service for use ~~solely with respect to~~ of this Project. The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including ~~copyrights~~ copyrights until transfer of ownership of the Instruments of Service to Owner. <u>Upon payment to Architect of sums due hereunder, those drawings, specifications, models, renderings and work product prepared in connection with the Project (sometimes referred to as the "Instruments of Service") for which Architect has been paid shall become the property of Owner.  Upon payment of all sums due hereunder, all Instruments of Service shall become the property of Owner.  Architect shall deliver any and all such drawings and specifications to Owner, and Architect agrees to make no further use thereof.</u>

14.   The parties modified §1.3.2.2 of the Form O/A Agreement as follows:

> Upon execution of this Agreement, <u>and during</u> the <u>period that Ownership of the Instruments of Service remain with the Architect, the</u> Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service solely for purposes of constructing, using and maintaining the Project, provided that the Owner shall comply with all obligations, including prompt payment of all sums when due, under this Agreement. The Architect shall obtain similar nonexclusive licenses from the Architect's consultants consistent with this Agreement.  Any termination of this Agreement prior to completion of the Project shall terminate this license.  Upon such termination, the Owner shall refrain from making further reproductions of Instruments of Service and shall return to the Architect within seven days of termination all originals and reproductions in the Owner's possession or control. If and upon the date the Architect is adjudged in default of this Agreement, the foregoing license shall be deemed terminated and replaced by a second, nonexclusive license permitting the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of completing, using and maintaining the Project.  <u>To</u>

---

[14]    The "strike-throughs" and "underlined" words are reproduced as they appear in the O/A Agreement.

the fullest extent permitted by law, the Owner shall indemnify and save harmless the Architect from and against any and all claims, demands, suits, judgments, liability, damages, costs of expenses (including attorney's fees and other defense costs) arising in connection with any use by the Owner or others authorized by the Owner of the Instruments of Service subsequent to the termination of the Architect for default.

15. As Ewing provided services to the Debtor, it sent monthly invoices to the Debtor, as authorized by §1.5.7 of the O/A Agreement.[15]

16. Section 1.5.8 of the O/A Agreement provides that payments are due thirty (30) days from the date of the invoice.

17. In March 2010, Ewing completed preparation of the initial Plans for the Courthouse Project, the March Plans.[16]

18. Prior to April 27, 2010, Ewing invoiced the Debtor for all of the work it performed in preparing the March Plans.

19. Prior to April 27, 2010, the Debtor paid Ewing for all of the services Ewing provided in preparing the March Plans.

20. After the March Plans were completed, certain governmental authorities made comments or mandated changes in the Courthouse Project that required Ewing to revise the March Plans.

21. Between March and May 2010, Ewing revised the March Plans and created a set of modified plans ("the May Plans").

---

[15]    The O/A Agreement provided for Ewing to receive a total of $6,896,483.00 in compensation. (See Ex. EC-2).

[16]    Section 1.3.2.1 employs the "Instruments of Service" as the term describing the architect's written work product ("drawings, specifications and other documents"). In this Memorandum, for the most part, I will use the more common term "Plans" in lieu of "Instruments of Service."

22. On April 27, 2010, Ewing sent the Debtor an invoice in the amount of $298,953.00 ("the April 27, 2010 Invoice").

23. The Debtor did not pay the April 27, 2010 Invoice and has made no payments to Ewing since the issuance of the April 27, 2010 Invoice.

24. The Debtor did not pay for the services rendered by Ewing in preparing the May Plans.

25. On June 8, 2010, Ewing, through its counsel, sent the Debtor a letter that:

    a. gave the Debtor notice of the default in failing to pay the April 27, 2010 Invoice under §1.3.8.1 of the O/A Agreement;[17]

    b. advised the Debtor that due to its nonpayment of all sums due under the O/A Agreement, Ewing considered itself the owner of "the Construction Documents and Specifications," which include the March Plans and the May Plans.

26. On June 17, 2010, Ewing, through its counsel, sent the Debtor a letter that:

    a. gave the Debtor notice of Ewing's termination of the O/A Agreement;[18]

    b. demanded payment of the April 27, 2010 Invoice and monies falling due after the date of that invoice, for a total demand of $651,604.71;

    c. reiterated Ewing's position that Ewing is the owner of all of the Plans it prepared in connection with the Courthouse Project.

27. Prior to approximately seven to ten years ago, and consistent with §1.3.2.1 of the Form O/A Agreement, it was common for architects' contracts with property owners to provide for the

---

[17] Section 1.3.8.1 of the O/A Agreement provides that the Debtor's failure to make payments required under the Agreement and to cure the default with seven days after receiving notice of the default, constitutes "substantial nonperformance" and cause for termination or suspension of Ewing's obligation to perform under the Agreement.

[18] The letter did not reference the provision of the O/A Agreement Ewing relied upon in terminating the Agreement. Section 1.3.8.4 provides that, upon seven days' written notice, either party may terminate the Agreement upon a substantial failure to perform by the other party occurring through no fault of the terminating party.

-10-

architect to retain all ownership rights of the plans prepared by the architect in connection

with the project that was the subject of the contract, while providing the owner with a non-

exclusive license to use the plans in connection with the project.

28.    In the past seven to ten years, it has become common in the industry for property owners to

request, and for architects to consent to, modifications of §1.3.2.1 of the Form O/A

Agreement.  Section 1.3.2.1 is modified regularly to provide that ownership of the

architectural plans will pass from the architect to the property owner at some point in time.

29.    There is no settled custom or usage in the industry, however, regarding precisely <u>when</u> the

ownership of the plans will pass to the property owner in connection with those contracts

that provide that ownership of the architectural plans will pass from the architect to the

property owner.[19]

## IV. CONCLUSIONS OF LAW  – DISCUSSION

### A.

Resolution of this contested matter requires that the court interpret a contract.[20]  Central

to the dispute is the meaning of two sentences in §1.3.2.1 of the O/A Agreement.  Both of these

sentences were added to the Form O/A Agreement, a form contract regularly used in the industry.

The sentences are quoted below.

---

[19]    Finding of Fact Nos. 27-29 are based on the testimony of Harvey Kolodner.  I credit his testimony on this subject.

[20]    For a brief discussion of the difference between contract interpretation and construction, see <u>Williams v. Metzler</u>, 132 F.3d 937, 946-47 (3d Cir. 1997).

### Sentence #1

Upon payment to Architect of sums due hereunder, those drawings, specifications, models, renderings and work product prepared in connection with the Project (sometimes referred to as the "Instruments of Service") for which Architect has been paid shall become the property of Owner.

### Sentence #2

Upon payment of all sums due hereunder, all Instruments of Service shall become the property of Owner.

Ewing maintains that ownership of the March Plans never passed to the Debtor because, in its view, Sentence #2 provides for the Debtor to become the owner of the Plans only after the Debtor has paid all sums due the entire Agreement. Because it is undisputed that the Debtor has not done so, Ewing contends that it retains ownership of the Plans. Further, Ewing contends that, pursuant to §1.3.2.2 of the Agreement, the termination of the O/A Agreement terminated the Debtor's license to use the March Plans .

The Debtor reads Sentence #1 to provide that ownership of work documents prepared by Ewing (such as the March Plans) passes to the owner as soon as the Debtor has paid the invoice for the services that produced those documents and that the vesting of ownership pursuant to Sentence #1 is unaffected if the owner subsequently default in its payment obligations under the Agreement.   Here, because Debtor paid all of Ewing's invoices that were related to the preparation of the March Plans, the Debtor argues that it owns those Plans. The Debtor acknowledges that it did not pay all of the invoices for services Ewing provided, inter alia, in revising the March Plans and therefore, claims no ownership interest in those revisions.[21] The

---

[21]      It follows from this concession that the Debtor does not own the revisions to the March Plans.  Because Ewing  terminated the Debtor's license to use the revisions, Ewing should not be restrained by the automatic stay from exercising control over them.  The revisions resulted in the document referred to as the May Plans.  However, the ownership rights with respect to the documents that comprise the May Plans is unclear.  The Debtor suggests that the differences between the March

(continued...)

Debtor argues that its payment default after April 27, 2010 has no effect on its ownership of the March Plans.

## B.

The O/A Agreement provides that it is governed by and is to be construed under Pennsylvania law. (O/A Agreement §§1.3.5.2, 1.3.7.1). Last year, in In re Stuart, 402 B.R. 111 (Bankr. E.D. Pa. 2009), I had occasion to summarize certain cardinal principles of contract interpretation in Pennsylvania. For the sake of brevity, I can distill that general discussion down to three principles that are applicable in the present matter:

1.  The meaning of an unambiguous written contract must be determined by its contents alone without resort to extrinsic aids or evidence.

2.  A term is ambiguous if it is reasonably susceptible to different meanings and in evaluating whether a term is ambiguous, the term should be give its plain and ordinary meaning.[22]

3.  If a contract provision is ambiguous, two consequences follow. First, the meaning of the provisions is an issue of fact to be determined by the factfinder, rather than an issue of law. Second, the parties may offer extrinsic evidence to clarify the meaning of the ambiguity.

---

[21](...continued)

Plans and the May Plans may not be substantial and that Ewing's use of the May Plans may be tantamount to use of the March Plans. If so, and if the Debtor owns the March Plans, according to the Debtor, Ewing's use of the May Plans would violate 11 U.S.C. §362(a)(3). The parties did not develop a record that would permit a determination whether use of the May Plans would violate 11 U.S.C. §362(a)(3). In any event, in light of my determination that Ewing has the superior claim of ownership to the March Plans, it is unnecessary for me to consider the issue further.

[22]    Generally, in making the determination whether a contract term is ambiguous, the court focuses on the language in the contract itself, although there also are some circumstances in which the court can consider extrinsic evidence in determining whether a text of the contract includes a "latent" ambiguity. See Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93-96 (3d Cir. 2001).

Stuart, 402 B.R. at 127-28 (& authorities cited therein).[23]

## C.

At the beginning of the First Hearing, I ruled that §1.3.2.1 of the O/A Agreement is ambiguous and therefore, that the parties could offer extrinsic evidence to assist in clarifying its meaning. I adhere to that view.

Standing alone, Sentence #1 is clear. It provides that the Debtor becomes the owner of the Instruments of Service (which include what I have been calling "the Plans") as soon as the Debtor has paid for them. Viewed in isolation, Sentence #1 provides a comprehensive rule for determining when ownership passes. Based on this principle, at every stage of their contractual relationship the parties would know, with some degree of certainty,[24] whether a set of Plans is owned by the Debtor or by Ewing.

To be clear and complete on the subject of the passage of ownership, the Agreement need not have stated anything further after Sentence #1. But the Agreement does say more. Sentence #2 immediately follows Sentence #1 and addresses the same subject, i.e., when

---

[23]    In Stuart, I also observed that in interpreting ambiguous contract terms, courts in Pennsylvania regularly seek guidance from the certain rules set forth in the Restatement (Second) of Contracts §§ 201- 206 (West 2010) ("Restatement"). However, my review of those provisions do not yield any specific interpretive aid that would appear decisive in ascertaining the parties' intent in §1.3.2.1 of the Agreement.

[24]    I qualify the statement in the text because it is possible that if the Debtor made only a partial payment on an invoice, the parties might disagree as to whether the Debtor's partial payment of an invoice should be allocated first to services attributable to the preparation of the Plans or to other services provided by Ewing.

ownership of the Plans passes to the Debtor.  Sentence #2 then states a different rule: that

ownership of the Plans passes to the Debtor, not after payment for the discrete set of services

rendered that are related to the creation of particular work documents, but only upon completion

of all of the payments due Ewing under the entire Agreement, i.e., ownership passes at the end of

the project after the Debtor has fully performed its entire payment obligation under the O/A

Agreement.[25]  Just as Sentence #1, standing alone, provides a clear and complete rule for the

timing of the passage of ownership of the Plans to the Debtor, so too does Sentence #2, standing

alone.

    The problems created by the juxtaposition of these two sentences are: (1) Sentence #2

states a different rule that conflicts with Sentence #1 and (2) neither sentence can be applied on

its own terms without negating the other or rendering the other surplusage.  See generally

Restatement §203(a) (favoring interpretation that give effect to all contract terms over

interpretation that does not).

    Ewing has presented no argument to harmonize the two sentences.  The Debtor, however,

argues that the two sentences can be harmonized because they address different time periods in

the contractual relationship.  Therefore, the Debtor suggests that there is no ambiguity in

§1.3.2.1.

    According to the Debtor, Sentence #1 is clear and specific and because, by its terms, the

conditions for passage of ownership of the March Plans have occurred (i.e., payment), the court

---

[25]        Admittedly, Sentence #2 is a bit terse.  However, its use of the phrase "all sums due
hereunder" necessarily refers to the entirety of the Debtor's payment obligations under the Agreement.
The Debtor has not suggested any alternative meaning to the term "all sums due hereunder," except to
suggest that, in light of Sentence #1, Sentence #2 only applies to Plans which have not already passed to
the Debtor as of the moment that the Debtor completes its payment obligation under the Agreement.  I
consider (and reject) this suggested meaning later in the discussion in the text.

need not analyze the contract any further.  As for Sentence #2, the Debtor implies that it serves as a kind of residuary provision that comes into play at the end of the contract, providing for the transfer of any work documents that were not previously transferred to the Debtor pursuant to Sentence #1.

While perhaps a cursory reading of the two sentences at issue may support the Debtor's position, upon closer examination of the text, the argument does not hold up.  The flaw is that if, at the end of the contract, any work documents exist that have not yet been paid for (and therefore, are still owned by Ewing), the final payment by the Debtor under the contract that purportedly would trigger the asserted "residuary" effect of Sentence #2 would also effectuate the transfer or ownership under Sentence #1. In other words, based on the Debtor's final payment, the last set of plans still owned by Ewing would pass to the Debtor under Sentence #1, even if Sentence #2 did not exist.  Thus, the Debtor's suggested interpretation gives Sentence #2 no independent meaning.  There is no residuary effect; if Sentence #1 is given effect, Sentence #2 adds nothing to Sentence #1.  Moreover, if Sentence #2 is read to mean that no Plans pass to the Debtor until payment in full of the Debtor's entire payment obligation under the Agreement, then Sentence #1 completely negates Sentence #2.

To summarize, read independently, each of the two sentences is clear.  When put together in succession in the same contract provision, Sentence #2 negates Sentence #1, while Sentence #1, at best, renders Sentence #2 superfluous and, at worst, negates it.  Due to this conflict, §1.3.2.1 is an ambiguous contract provision.  See Com., Dept. of Transp. v. Gramar Const. Co., 454 A.2d 1205, 1207 (Pa. Commwlth. Ct. 1983) (conflicting provisions support conclusion that contract is ambiguous); see also United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810, 813

-16-

(Del. Ch. 2007) (same).

### D.

Faced with an ambiguous contract provision, a court may consider extrinsic evidence in interpreting the meaning of the provision. Unfortunately, the extrinsic evidence in the record provides no meaningful assistance in determining the parties' intentions with respect to the issue at hand.

It is obvious from the revisions to §1.3.2.1 that the parties intended to change the Form O/A Agreement, which, untouched, would have left ownership of the Plans with Ewing. But there was no testimony at the First Hearing of any negotiations regarding when ownership would pass or why the particular language added to §1.3.2.1 was chosen.

Also, while there was some evidence presented regarding custom and usage in the industry, it too, did not address the precise issue before the court. The testimony offered suggested only that architects frequently agree to modify §1.3.2.1. to permit ownership of the Instruments of Service to pass to the property owner. However, there was no testimony suggesting that any custom or usage exists regarding when such ownership passes, i.e., whether it will pass in the midst of the construction project on a "pay and own as you go" basis or only when the owner's entire payment obligation has been satisfied.

### E.

Another tool a court may use to ascertain the meaning of an ambiguous contract term is to search for textual clues elsewhere in the O/A Agreement, outside of Sentence #1 and Sentence

-17-

#2.  Unfortunately (again), this exercise does not yield an answer.

**1.**

To bolster their respective interpretations of §1.3.2.1, both parties claim to find support in

the next provision of the Agreement, §1.3.2.2.  Generally speaking, in §1.3.2.2, Ewing grants the

Debtor a license to use the Plans in connection with the Courthouse Project.  The grant of the

license necessarily is premised on the assumption that Ewing owns the licensed Plans.  The

provision also provides for the termination of the license in certain circumstances prior to the

completion of the Courthouse Project.

During the hearing, the Debtor pointed to Sentence #1 of §1.3.2.2 (which in the context

of this Memorandum, I will refer to as "Sentence #3").[26]  Sentence #3 states:

> **Sentence #3**
> Upon execution of this Agreement, and during the period that Ownership of the
> Instruments of Service remain with the Architect, the Architect grants to the
> Owner a nonexclusive license to reproduce the Architect's Instruments of Service
> solely for purposes of constructing, using and maintaining the Project, provided
> that the Owner shall comply with all obligations, including prompt payment of all
> sums when due, under this Agreement.[27]

The Debtor maintains that the addition of the phrase "during [the] period that Ownership

of the Instruments of Service remain with the Architect" to the Form O/A Agreement is

instructive.  The Debtor suggests that use of this phrase is consistent with Sentence #1 and its

---

[26]     In its post-hearing Memorandum, the Debtor did not reiterate this particular argument.
But I do not consider it as having been abandoned, particularly because Ewing responded to the argument
in its post-hearing Memorandum.

[27]     As with the prior quotations of the provisions of the Agreement, the underlining in the
text is as it appears in the actual Agreement.

inclusion manifests the parties' implicit recognition that there may be circumstances throughout the course of the O/A Agreement that ownership of the Plans will not remain with Ewing.

However, I find Ewing's response on this issue blunts the force of the Debtor's argument. As Ewing points out, this language added to §1.3.2.2 was only one of a number of changes and additions to the Form O/A Agreement.  Prior to the changes in §1.3.2.1 and §1.3.2.2, there were no circumstances in which §1.3.2.1 provided for ownership of the Plans to pass from the architect to the owner; the architect retained the ownership rights in perpetuity.  Therefore, in its original form in §1.3.2.2 of the Form O/A Agreement, Sentence #3 provided that upon execution, the architect granted the owner a license to use the plans in order to construct the project, subject to certain subsequent events that might result in termination of the license. There was no reference in "old" §1.3.2.2 to any period of time that the Plans remained with Ewing because such a reference was unnecessary; the Plans always remained with Ewing.  Ewing contends that the additional language added to Sentence #3 simply serves to clarify that the license arrangement need be in place only during those periods in which Ewing, and not the Debtor, owns the Plans.

I agree with Ewing's main point on this issue.  While the additional phrase in Sentence #3 certainly recognizes that ownership of the Plans may pass from Ewing to the Debtor, it does not speak to the question of <u>when</u> the ownership will pass.  Sentence #3 can be read to complement Sentence #2 just as much as it complements Sentence #1.  Therefore, it does not assist in the interpretation of §1.3.2.1 of the Agreement.[28]

---

[28]    Similarly, I am unpersuaded by the Debtor's argument that §1.3.2.4 of the O/A Agreement and the accompanying Agreement for Delivery of Documents in Electronic Form ("the Electronic Document Agreement") incorporated by §1.3.2.4, "corroborates" the parties' intent that

(continued...)

**2.**

Ewing too, comes up short in its effort to find textual support for its interpretation of

§1.3.2.1 in §1.3.2.2 of the Agreement.

Ewing argues that the following two consecutive sentences in §1.3.2.2 (referred to as

"Sentence #4" and "Sentence #5") demonstrate the parties' intent that ownership of the Plans

would pass to the Debtor only after full payment under the O/A Agreement:

> **Sentence #4**
> Any termination of this Agreement prior to completion of the Project shall
> terminate this license.

> **Sentence #5**
> Upon such termination, [the Debtor] shall refrain from making further
> reproductions of Instruments of Service and shall return to [Ewing] within seven
> days of termination **all originals and reproductions in [the Debtor's]
> possession or control**. (emphasis added).

Based on the emphasized language of Sentence #5, particularly the word "all," Ewing

suggests that these two sentences reflect the parties' understanding that any termination of the

Agreement before both parties have fully performed would result in the Debtor's return of <u>all</u>

Plans in the Debtor's possession, thus implying that all of the Plans remained property of Ewing

(subject to the license granted to the Debtor) until the completion of the Courthouse Project.

---

[28](...continued)
Sentence #1 is the operative provision to the exclusion of Sentence #2. The Debtor points to Paragraph
13 of the Electronic Document Agreement, which provides:

> Ownership in the Electronic Documents shall be transferred to the Owner in
> accordance with the provisions of Section 1.3.2 of the Agreement. Upon transfer
> of ownership of the Electronic Documents to the Owner, this Agreement will no
> longer govern the use of the Electronic Documents from the date of such
> transfer.

However, like §1.3.2.2, nothing in Paragraph 13 of the Electronic Document Agreement sheds any light
on the parties' intention regarding when ownership of the Plans pass from Ewing to the Debtor.

The Debtor responds by pointing out that the word "all" in Sentence #5 modifies "originals and reproductions," not Instruments of Service. Thus, according to the Debtor,

> "Instruments of Service" is the antecedent of "all originals and reproductions." [The phrase] "all originals and reproductions" is merely a subset of "Instruments and Service." The meaning of the phrase "Instruments of Service" is the real question. It is not informed by the phrase "all originals and reproductions."

Debtor's Memorandum at 2.

I agree with the Debtor on this point. The purpose of Sentence #5 is to impose certain obligations on the Debtor, after termination of the Agreement, with respect to the Plans or other documents in which the Debtor previously held a license. Sentence #5 merely points out that if the termination occurs and the Debtor's license is terminated, the Debtor's duty is comprehensive with respect to those "licensed" documents that the Debtor has the duty to return to Ewing. If, however, as the Debtor contends, ownership of certain Plans has already passed to the Debtor pursuant to Sentence #1, then Sentence #5 is irrelevant because the Plans are not subject to the license; they are owned outright by the Debtor. In short, Sentence #5 is as consistent with Sentence #1 as with Sentence #2.

## F.

Ewing argues that the doctrine of contra proferentem (construe against the drafter) should be applied in this case and that the ambiguity in §1.3.2.1 in the O/A Agreement be construed against the Debtor.

In Pennsylvania, the doctrine of contra proferentem is a rule of policy, not one of contract interpretation:

> The rule is not actually one of interpretation, because its application does not assist in determining the meaning that the two parties gave to the words, or even

> the meaning that a reasonable person would have assigned to the language used. It is chiefly a rule of policy, generally favoring the underdog. It directs the court to choose between two or more possible reasonable meanings on the basis of their legal operation, i.e., whether they favor the drafter or the other party.

Stuart, 402 B.R. at 132 (quoting 5 Arthur L. Corbin & Margaret N. Kniffin, Corbin on Contracts

§24.27 (rev. ed. 2007)).

    The Pennsylvania Supreme Court has cautioned that the doctrine is to be applied only in

limited situations.

> [T]he rule is not intended as a talismanic solution to the construction of ambiguous language. . . . Where a document is found to be ambiguous, inquiry should always be made into the circumstances surrounding the execution of the document in an effort to clarify the meaning that the parties sought to express in the language which they chose.  It is only when such an inquiry fails to clarify the ambiguity that the rule of construction relied upon by the chancellor should be used to conclude the matter against that party responsible for the ambiguity, the drafter of the document.

Stuart, 402 B.R. at 133 (quoting Burns Mfg. Co. v. Boehm, 356 A.2d 763, 767 n.3 (Pa. 1976)

(citations omitted)).  For the reasons expressed in Boehm, the doctrine also has been described as

a "rule of last resort" or a "tie breaker," invoked when no other sound basis exists for choosing

one contract interpretation over another.  Stuart, 402 B.R. at 133 (quoting Gardiner, Kamya &

Assocs, P.C. v. Jackson, 467 F.3d 1348, 1353 (Fed. Cir. 2006)).

    In the circumstances presented here, I find it appropriate to apply the doctrine of contra

proferentem.  Because I have concluded that neither a textual examination of the O/A Agreement

nor the extrinsic evidence presented by the parties clarifies the parties' intentions with respect to

the point in time that ownership of the March Plans was to pass from Ewing to the Debtor, I find

it necessary, as a last resort, to invoke the doctrine of contra proferentem and construe the

ambiguity in §1.3.2.1 of the O/A Agreement against the drafter.

-22-

Further, as a policy matter, I find it equitable in the present circumstances to apply the

doctrine.

Presumably, the starting point in the parties' negotiations, was §1.3.2.1 of the Form O/A

Agreement, which provided for ownership of all Plans to remain with Ewing.  There is no

dispute that parties agreed to modify §1.3.2.1 to provide for ownership to vest in the Debtor

under certain conditions.  Undoubtedly, this change was made at the Debtor's request.  Ewing

acceded to the Debtor's request, agreeing in principle to relinquish ownership of the Plans upon

certain conditions.  I have no specific information regarding the process that led to this meeting

of minds;[29] I know only that the final language was drafted by the Debtor's representative.

It strikes me as appropriate to construe the contract ambiguity against the Debtor because

it was the Debtor that both requested the change in the prior status quo (i.e., that requested that

the version §1.3.2.1 found in the Form O/A Agreement be modified) and drafted the ambiguous

language to effectuate that change.  As between the two parties, it seems reasonable to impose on

the Debtor (as both the party moving to modify the form contract and the drafter of the proposed

revision) the responsibility to express clearly the degree to which it was proposing to alter the

status quo.  This analysis finds support in the Restatement:

> Where one party chooses the terms of a contract, he is likely to provide more
> carefully for the protection of his own interests than for those of the other party.
> He is also more likely than the other party to have reason to know of uncertainties
> of meaning. Indeed, he may leave meaning deliberately obscure, intending to
> decide at a later date what meaning to assert. In cases of doubt, therefore, so long
> as other factors are not decisive, there is substantial reason for preferring the
> meaning of the other party.

Restatement § 206 cmt. a.

---

[29]    For example, I have no information whether there were oral negotiations regarding
§1.3.2.1 or whether the parties exchanged drafts before settling on the final language.

For these reasons, and there being no dispute that the ambiguous language in the O/A

Agreement at issue was drafted by the Debtor's representative, I will construe the ambiguity

against the Debtor.

## G.

I write further only to clarify briefly the reach of this decision.

The only matter being determined is Ewing's request for relief from the automatic stay.

Ewing asserts that, to the extent the automatic stay even applies, "cause" for relief from the

automatic stay exists under §362(d) because Ewing, not the Debtor, is the owner of the Plans.  As

the Debtor pointed out in its Motion to Strike, see Part II, supra, Ewing's request for relief

requires a determination regarding the existence and the extent of each party's asserted property

interest in the March Plans.

Arguably, a definitive adjudication on the issue of ownership of the March Plans requires

the initiation of an adversary proceeding.  See Fed. R. Bankr. P. 7001(2), (9).[30]  But see In re

ExpressTrak, L.L.C., 2004 WL 3735125, at *3 (Bankr. E.D. Mich. Jan. 20, 2004) (based on text

of Rule 7001(9), suggesting that not every type of request for declaratory relief requires the

initiation of an adversary proceeding).  However, the mere fact that the merits of a dispute

regarding ownership of an asset in which the bankruptcy estate claims an interest is relevant in

determining the merits of a motion for relief from the automatic stay is not, by itself, grounds to

---

[30]     Rule 7001 provides, in pertinent part, that an adversary proceeding is one

> (2) to determine the validity, priority, or extent of a lien or other interest in
> property, other than a proceeding under Rule 4003(d) . . .

> (9) to obtain a declaratory judgment relating to any of the foregoing . . . .

-24-

deny the motion or to compel the movant to seek stay relief by way of adversary complaint.

The Bankruptcy Code mandates that stay relief hearings relating to a creditor's interest in

property be heard expeditiously, see 11 U.S.C. §362(e). Accordingly, such hearings are summary

in nature.

> The limited grounds set forth in the statutory language, read in the context of the
> overall scheme of § 362, and combined with the preliminary, summary nature of
> the relief from stay proceedings, have led most courts to find that such hearings do
> not involve a full adjudication on the merits of claims, defenses, or counterclaims
> . . . .

In re Sunshine Three Real Estate Corp., 2009 WL 3617798, at *7 (Bankr. D. Mass. Oct. 26,

2009).

How then should a court handle a stay relief motion that requires a determination that

ordinarily would be resolved through a Rule 7001 adversary proceeding or some other

proceeding (such as an objection to the movant's claim) that is less summary in nature than a

motion for relief under §362(d)?

In In re Nuclear Imaging Sys., Inc., 260 B.R. 724, 731 (Bankr. E.D. Pa. 2000), the court

suggested the following:

> Given the need for summary treatment of lift stay motions, when a party opposes a
> motion of a creditor to terminate the stay and raises affirmative defenses to the
> validity of the claim itself, it may often be proper to require that the objector come
> forward during the lift stay hearing simply with sufficient evidence to demonstrate
> that there is a reasonable probability that the objector would prevail in later
> litigation which can completely determine those challenges to the claim.

Accord Sunshine Three Real Estate Corp., 2009 WL 3617798, at *8 ("To allow a relief from stay

hearing to become any more extensive than a quick determination of whether a creditor has a

colorable claim would turn the hearing into a fullscale adversary lawsuit . . . and would be

inconsistent with this procedural scheme"). In effect, the determinations made in a stay relief

-25-

hearing are akin to those made in a preliminary injunction hearing.[31]

Applying the Nuclear Imaging Systems model to the case at hand, I have concluded that the Debtor is not likely to prevail in its position that it, rather than Ewing, owns the March Plans. Consequently, as the likely owner of the Plans, Ewing should be able to use and control those Plans. These findings establish that "cause" exists for relief from the automatic stay under 11 U.S.C. §362(d)(1).

An order consistent with this Memorandum was entered on August 26, 2010.


Date:  **August 27, 2010**

                                      _____
                                      **ERIC L. FRANK**
                                      **U.S. BANKRUPTCY JUDGE**

---

[31]      Among the requirements for the issuance of a preliminary injunction are that the movant show a likelihood of success on the merits. E.g., Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004); see generally Brown v. City of Pittsburgh, 586 F.3d 263, 296 n.41 (3d Cir. 2009) (the standard rule is that findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits) (quotations and citations omitted).